UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Civil No. 07-4168 (JRT/FLN) |
| Petitioner, | |
| v. | **REPORT AND RECOMMENDATION** |
| Marcus Lassiter, | |
| Respondent. | |

David W. Fuller, Assistant United States Attorney, for the Government.
Katherine Menendez, Assistant Federal Defender, for Defendant.

**THIS MATTER** came before the undersigned United States Magistrate Judge on November 29, 2007, on the Government's Petition to Determine Present Mental Condition of an Imprisoned Person under 18 U.S.C. § 4245 [#1] at the Federal Medical Center in Rochester, Minnesota. The petition alleges that Marcus Lassiter presently suffers from a mental disease or defect for the treatment of which he is in need of custody and care in a suitable psychiatric facility. Federal Medical Center staff psychiatrist Dr. Daniel J. Shine, Jr. testified at the hearing. Mr. Lassiter did not testify. The Government submitted three exhibits into evidence.[1] For the reasons which follow, this Court recommends the Government's Motion be **GRANTED**.

**I.    FINDINGS OF FACT**

---

[1]  Gov't Ex. 1:   Dr. Daniel Shine's Curriculum Vitae.
    Gov't Ex. 2:   Mental Health Evaluation Update Dated 11-09-07 for Marcus Lassiter.
    Gov't Ex. 3:   CD Containing Medical Records, Central File, Psychology Data Systems Records for Marcus Lassiter.
    Gov't Ex. 3(a): Updated Records for Marcus Lassiter from Psychology Data System.
    Gov't Ex. 3(b): Updated Records for Marcus Lassiter from Psychology Data System.

**A. Lassiter's History of Mental Illness**

Respondent Marcus Lassiter ("Lassiter") is currently serving a 120-month sentence for Conspiracy to Distribute and Possession with Intent to Distribute Cocaine. (Gov't Ex. 3 at 0022.) He has a projected release date of June 25, 2008. *See* Gov't Ex. 2 at 1. Prior to Mr. Lassiter's current incarceration, he was convicted of Assault, Battery and Obstruction of Justice with Force in 1996. (*Id.*) He was also convicted of reckless handling of a firearm, a misdemeanor, and sentenced to 60 days in jail. (*Id.*)

Prior to serving time in the Bureau of Prisons, Mr. Lassiter claims he received no mental health treatment. (*Id.*) at 2. Mr. Lassiter has been on suicide watch six times since 2003, most recently in January of 2006. (*Id.*) He was first put on suicide watch from January 14, 2003 until January 22, 2003 at the Federal Correctional Institution ("FCI") at Fairton, New Jersey, because he stated on more than one occasion that he wanted to kill himself because the other inmates were teasing him. (*Id.*) The staff recommended medication but Lassiter reportedly stated that it was possible he would horde the medications to attempt suicide. (*Id.*)

Mr. Lassiter told staff that he has experienced depressive symptoms and unusual perceptual experiences since the age of 14 and had attempted suicide twice in the past. (*Id.*) On February 5, 2003, Mr. Lassiter requested that his medication be discontinued. (*Id.*) On February 24, 2003, he met with psychology services where he again requested that his medication be discontinued but he agreed to continue taking Zoloft. (*Id.*) A few days later he was observed spitting out medication in the pill line. (*Id.*) In the days following this incident, Lassiter promised to continue taking his medications for one more month, but in spite of this promise, he discontinued taking them on April 9, 2003, because he felt that his emotional stability had

improved. (*Id.*) On April 21, 2003, Lassiter was transferred to FCI Gilmer. (*Id.*)

At FCI Gilmer, Mr. Lassiter was placed on suicide watch for one day on August 5, 2003 after he asked a counselor if she believed he was capable of committing suicide. (*Id.*) Lassiter denied suicidal ideation, plan and intent. (*Id.*) The staff at Gilmer described Lassiter as having restricted affect, soft speech, slow thought processes, lacking spontaneous speech, exhibited behavior consistent with someone who is depressed including having a tendency to isolate himself. (*Id.*)

Lassiter was again placed on suicide watch from September 15, 2003 until September 22, 2003, because he was thinking about harming himself and he was "hearing things." (*Id.*) at 3. The staff reported that, while on suicide watch, Lassiter's responses to questions were marked by paranoid ideation in that he believed that others were thinking and talking about him. (*Id.*) He stated that he had disturbing images in his head including that of his mother being murdered and another vision of his children getting burned. (*Id.*) He stated, "I feel like losing myself," and acknowledged suicidal ideation and was concerned he might not be able to control himself. (*Id.*) He refused antipsychotic medications because he thought that they were not helpful. (*Id.*) He also refused food and liquids. (*Id.*) The staff diagnosed Lassiter with Major Depressive Disorder, Severe with Psychotic Features, and notified Lassiter that he was being transferred to an inpatient psychiatric facility due to his mental health status and his failure to participate in treatment. (*Id.*) Lassiter stated that he did not wish to transfer and within 24 hours requested food, water, showers and agreed to take psychotropic medications. (*Id.*) He also participated in individual therapy and reportedly was taking Risperdal. (*Id.*)

By October 28, 2004, Lassiter had stopped taking his medications and staff described his

affect as normal in range and intensity. (*Id*.) Lassiter was again placed on suicide watch from April 11, 2005, until April 18, 2005, because he felt "depressed," admitted to having suicidal thoughts and stated it was possible he might hurt himself if he was not placed on suicide watch. (*Id*.) The staff noted that Lassiter appeared as though he was responding to internal stimuli during the initial evaluation and he indicated that he was seeing "visions." (*Id*.) He refused medication but stated he would consider psychotherapy. (*Id*.) He was diagnosed with Adjustment Disorder with Depressed Mood and Personality Disorder with Antisocial and Narcissistic Features. (*Id.*)

On April 29, 2005, Lassiter reportedly requested to be placed on suicide watch. (*Id*.) at 4. The staff interviewed Lassiter for four hours because he refused to directly answer questions and there were long pauses between questions and answers. (*Id*.) He provided "vague, coy, oblique responses" to the questions posed. (*Id*.) After the interview, the staff monitored Lassiter's phone calls and noted that Lassiter was able to converse in a normal fashion with respect to rate and volume and absence of long pauses. (*Id*.) After monitoring Lassiter's phone calls, the staff concluded that Lassiter's behavior during the four hour interview had been entirely volitional rather than a product of mental illness. (*Id.*) Lassiter later admitted he wanted to be placed on suicide watch because he feared for his safety when he was in the general inmate population. (*Id.*) During this interview, Mr. Lassiter appeared to staff to have louder, clearer speech and answered questions more directly. (*Id*.) He still admitted to suicidal ideation but denied plan and intent. (*Id*.) He agreed to be placed on Protective Custody (unverified) status. (*Id*.)

On June 19, 2005, Lassiter was placed on suicide watch because he reported racing

4

thoughts and seeing "weird things." (*Id*.)  Later, Lassiter admitted he sought to be placed on suicide watch in an attempt to protect himself from other inmates.  (*Id*.)  During the interview with psychology services, Lassiter reportedly presented in an "inconsistent" manner and stated he was on watch for both suicidal thoughts and protective purposes.  (*Id*.)   The staff concluded that Lassiter was malingering symptoms of psychosis in order to indirectly seek protective custody.  (*Id*.)  He was diagnosed with Malingering of Psychotic Symptoms Adjustment Disorder with Depressed Mood, and Personality Disorder Not Otherwise Specified.  (*Id*.)

On June 21, 2005, Mr. Lassiter was found competent and responsible for an incident report for Refusing to Work.  (*Id*.)  In a SHU (Secure Housing Unit) review note dated September 5, 2005, the writer stated Mr. Lassiter reportedly told staff he had "lied" to psychology services in order to be placed on Suicide Watch.  (*Id*.)  Because Lassiter stopped feigning symptoms of psychosis, his malingering and adjustment disorder diagnoses were removed in late September 2005.  (*Id*.)

On January 17, 2006, Lassiter was placed on suicide watch.  (*Id*.)  Lassiter requested to be placed there and staff recorded the possible reasons for the request: fear of returning to the compound after completion of his disciplinary segregation time, increasing fear of being harmed by others, self-imposed limited contact with family, and increasing fear that his family will be harmed by others. (*Id*.) at 5.  Lassiter indicated he had suicidal and assaultive ideation. (*Id.*) Lassiter reportedly took psychotropic medications and Prozac while on suicide watch and was taken off suicide watch on January 30, 2006. (*Id*.)

Lassiter was transferred to FCI Cumberland, Maryland, in May 2006. (*Id*.) at 5.  When he arrived, staff reports describe him as having "bland affect" and "depressed mood." (*Id*.)  He

5

was also described as having "depression in his eyes." (*Id.*) He was reported as having bizarre delusions that included themes of persecution. (*Id.*) He claimed that Psychology Services at FCI Gilmer conspired with inmates to give other inmates information about Lassiter. (*Id.*) In his transfer request, Lassiter stated he would prefer to spend his remaining two years in the SHU but did not provide any explanation for the request. (*Id.*) Staff described the inmate as engaging in odd behavior such as remaining in strange positions for long periods of time; for example it was reported he would wrap himself up in a sheet from head to toe to form a cocoon in which he would remain for the rest of the day. (*Id.*) Lassiter refused psychotropic medications. (*Id.*) According to records, he told staff that he requested a transfer because staff at FCI Gilmer made several clones of him and those clones were causing him distress. (*Id.*) A few months later, psychology services diagnosed Lassiter with Psychotic Disorder Not Otherwise Specified and requested a transfer to a Federal Medical Center. (*Id.*)

Mr. Lassiter was transferred to the Mental Health Unit ("MHU") at Federal Medical Center in Rochester, Minnesota, on June 27, 2006. *See* Gov't Ex. 2 at 1. Lassiter stated that the FCI Gilmer staff attempted to insert thoughts in his head, made "duplicate[s] of my eyes to they can see everything through my eyes," and these duplicated were placed on a "mannequin stored in the attic of the SHU." (*Id.* at 5.) He also said that staff had placed implants in other inmates so they could control the behavior of those inmates and cause them to harm Mr. Lassiter. He stated that voices perform black magic and want him to stop reading the Bible. (*Id.*)

Mr. Lassiter was initially housed in SHU for closer observation and it was reported the inmate made comments about his desire to stay in the SHU for the remainder of his sentence. (*Id.*) at 6. He refused temporary releases ("TRs") to the open unit while in SHU and refused to

take his prescribed medications. (*Id.*) On July 31, 2006, Lassiter was transferred to the Martin Wing, a semi-locked unit. (*Id.*) On September 5, 2006, he transferred from the Martin Wing to the open unit and reportedly adjusted appropriately to the unit. (*Id.*) He consistently refused psychotropic medications and functioned adequately. (*Id.*) Lassiter's treatment team determined that he should be transferred to the General Population ("GP") Unit at the FMC Rochester for continued observation in a less restrictive environment. *(Id.)* He was transferred to the FMC Rochester GP on December 13, 2006. (*Id.*) While in the GP, Lassiter was followed by psychology staff on a monthly basis. (*Id.*) He did not exhibit problems until late April 2007 when he endorsed auditory and visual hallucinations in the form of hearing voices and seeing "naked people running around." (*Id.*) In May 2007, Lassiter stated that several staff from FCI Gilmer were now witches; they had put a curse on him; he used to swing and punch at them until inmates made fun of him for doing it. (*Id.*) at 7. Lassiter said that the witches attempt to choke him when he does not give them enough attention and he is aware of this when he swallows. (*Id.*) He stated that he does not get enough sleep because the witches jump on his stomach and wake him up in the morning. (*Id.*) He claimed to see a brown substance when he brushes his teeth but he has not gone to the dentist because of his belief that the brown substance is due to the witches living in his body. (*Id.*)

In June 2007, Lassiter agreed to meet with a psychiatrist but stated he did not think he needed medication. (*Id.*) On June 15, 2007, Lassiter was redesignated to the Mental Health Unit at FMC Rochester because of self-injurious behavior. (*Id.*) He stated that when he was in the shower, "The witch was in the shower with me. I fought her off and hit my hand on the thing." (*Id.*) Lassiter did not demonstrate insight into his mental illness and continued to refuse

psychotropic medications. (*Id.*) During an interview with a staff psychiatrist, he continued to speak openly about his interactions with the witches. (*Id.*) During the interview, the inmate repeatedly pushed his eye glasses up on his nose and stated the witches were attempting to pull his glasses off his face. (*Id.*) He stated he could smell the "witches scent." *(Id.)* Lassiter was diagnosed with Schizophrenia, Undifferentiated Type. (*Id.*) at 8. Lassiter reported thoughts of wanting to harm staff from FCI Gilmer, but did not give any more information because the interview was not confidential. (*Id.*)

The original report recommending commitment under § 4245 was submitted in July 2007 because Lassiter refused treatment while continuing to complain of auditory, visual and tactile hallucinations involving witches. (*Id.*) Lassiter apparently, however, functioned adequately on the open unit despite his psychiatric symptoms. (*Id.*) He was observed doing well at his job assignment and did not have any obvious interpersonal problems with peers or staff. (*Id.*) The recommendation to pursue commitment under § 4245 was withdrawn on September 27, 2007, because of Lassiter's adequate adjustment to the open unit. (*Id.*) On September 30, however, Lassiter requested to be transferred to the SHU. (*Id.*) He told staff that he was hearing female voices commanding him to hurt others on the unit. (*Id.*) He told the staff repeatedly he would rather stay in SHU because he feels "safe from the witches." (*Id.*) On October 2, 2007, Lassiter refused to take antipsychotic medications. (*Id.*) He also refused TRs from the SHU. (*Id.*) On October 12, 2007, Lassiter began going to TRs for periods of approximately one hour each and did not exhibit any behavioral problems. (*Id.*) He did continue to tell staff he wanted to remain in the SHU because he felt safer there and continued to state he was bothered by voices. (*Id.*) The request for Lassiter's commitment under § 4245 was resubmitted because he has had

ongoing psychiatric symptoms, refuses treatment and has refused to live in the open unit since September 30, 2007. (*Id.*)

### B. Dr. Shine's Testimony

Dr. Shine began working as a staff psychiatrist at the FMC in July of 1997 when he completed his residency. (*See* Gov't Ex. 1.) From July of 2005 until July of 2006, he was employed as a consultant to the Department of Psychiatry and Psychology at the Mayo Clinic in Rochester, Minnesota, and then returned to the FMC to work as a psychiatrist. He has testified in over twenty hearings held pursuant to 18 U.S.C. § 4245 and § 4246.

Dr. Shine concluded to a reasonable degree of medical certainty that Lassiter is suffering from a mental disease, is in need of custody for care and treatment and that the Federal Medical Center in Rochester is a suitable facility for care and treatment. Dr. Shine first met Lassiter in March 2007. In this first meeting, Dr. Shine was struck by Lassiter's psychotic symptoms but noted that the inmate still functioned adequately on the compound. Dr. Shine saw Lassiter once per month after the first visit and concluded after his June 2007 meeting with Lassiter that the inmate needed treatment in the Mental Health Unit.

Dr. Shine testified that Lassiter has issues with witches whom he perceives with all of his senses. The witches who persecute him and tell him to do things to others such as rape, punch and hurt people. Lassiter told Dr. Shine that he tries to resist the witches' orders and sometimes seeks help by requesting placement in the SHU. Dr. Shine testified that he takes Lassiter's statements that the witches order him to hurt others at face value. Dr. Shine testified that Lassiter has rejected less secure housing placement and prefers the SHU where he is in lockdown. He stated that Lassiter has not been on suicide watch since he came to the FMC

Rochester but has been on "constant watch" in the Martin Wing.  Dr. Shine testified that Lassiter has little or no insight into his disease.  Lassiter told Dr. Shine that medications would be useless and does not have insight enough to know there is a danger he would hurt someone.

Dr. Shine stated he initiated the § 4245 petition in July but withdrew it because Lassiter was adjusting well to his transition in the open unit of the Mental Health Unit.  Dr. Shine stated that on September 27, 2007, he struggled with whether Lassiter's condition was bad enough to "need" treatment, but ultimately decided to withdraw the petition.  However, Dr. Shine testified that three days later, Lassiter's condition changed.  Lassiter requested to return to the SHU, which he did, because he was afraid he would harm others.  He stopped working and stopped going to classes.  Dr. Shine testified that Lassiter stated he did not feel comfortable being released from the SHU because he is uncomfortable being around others because the witches are telling him to harm others.

Dr. Shine testified that he diagnosed Lassiter with Undifferentiated Schizophrenia.  Dr. Shine testified that there are five symptom clusters that mental health professionals evaluate to determine whether an individual has schizophrenia: hallucinations, delusions, thought process, disorganized behaviors and negative symptoms.  Lassiter has had auditory hallucinations:  he says that witches are talking to him. He has had bizarre delusions: he believes that witches are inside him and he believed that he had been cloned at a prior institution.  He has had disturbed thought process: at times he is difficult to understand and can become incoherent when he talks about the witches.  He also has had negative symptoms: he lacks an ability to express his emotions.  Dr. Shine testified that he diagnosed Lassiter with schizophrenia because he was exhibiting four of the five characteristics of the disorder.

Dr. Shine testified that Lassiter would be eligible for half-way house placement in December of 2007 but because of Lassiter's mental status, his eligibility is on hold. Dr. Shine stated that he did not think that, at this time, Lassiter was capable of functioning at a half way house. If, however, Lassiter received treatment and exhibited signs of improvement, Dr. Shine stated he would approve Lassiter for release to a half way house. Dr. Shine stated he would treat Lassiter with medication to quiet psychotic symptoms, psychotherapy or group therapy, work therapy and release preparation. Dr. Shine stated that Lassiter is due to be released from prison in July of 2008.

## II.   CONCLUSIONS OF LAW

Pursuant to 18 U.S.C. § 4245, a federal prisoner may not be transferred to a mental hospital or treatment facility without the prisoner's consent or a court order. *See United States v. Watson*, 893 F.2d 970, 975 (8th Cir. 1990), vacated in part on other grounds by *United States v. Holmes*, 900 F.2d 1322 (8th Cir. 1990). If the prisoner objects to being transferred, the court must hold a hearing to determine if there is "reasonable cause to believe that the person may presently be suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility." 18 U.S.C. § 4245(a); *United States v. Jones*, 811 F.2d 444, 447 (8th Cir. 1987).

If the court finds by a preponderance of the evidence that the person is presently suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility, the court shall commit the person to the custody of the Attorney General. 18 U.S.C. § 4245(d). Whether a person is in need of care or treatment is a question of fact, left to the judicial decision maker. *Watson*, 893 F.2d at 972. If the court determines that the inmate

is suffering from a mental disease and is in need of treatment, the Attorney General must then hospitalize the prisoner "for treatment in a suitable facility until he is no longer in need of such custody for care or treatment or until the expiration of the sentence of imprisonment, whichever occurs earlier." 18 U.S.C. § 4245(d).

This Court is, therefore, required to determine three issues: 1) whether Lassiter suffers from a mental disease or defect; 2) whether Lassiter is in need of custody for care or treatment of that disease or defect; and 3) whether the FMC, the proposed facility, is a suitable facility. For the reasons set forth below, this Court concludes that the answer to all of these questions is yes.

**A. Mental Disease or Defect**

The Government has met its burden of establishing by a preponderance of the evidence that Lassiter suffers from a mental disease or defect. *See* 18 U.S.C. § 4245(d) (burden of proof). Dr. Shine testified that he diagnosed Lassiter as suffering from Schizophrenia, Undifferentiated Type. Dr. Shine based his assessment on Lassiter's records and central file, his personal interactions with him, and reports from other FMC staff. He testified that Lassiter suffers from four of the five groups of symptoms indicative of schizophrenia, including hallucinations, delusions, disturbed thought process, and negative symptoms. Dr. Shine testified that Lassiter has auditory hallucinations about witches and delusions that the witches inhabit his body. Dr. Shine stated that Lassiter has been incoherent in some of their meetings together and that he has had difficulty expressing his emotions. Even though there is some evidence in the Mental Health Evaluation Update that Lassiter may have been feigning symptoms at previous facilities in order to be placed in a housing facility Lassiter thought was safer, the Court finds Dr. Shine's testimony to be credible and agrees with him that Lassiter suffers from a mental disease or defect.

**B. In Need of Custody for Care or Treatment**

The Court finds that Lassiter is in need of custody for care or treatment. The term "need" is not defined by 18 U.S.C. § 4245. Whether a person is in need of care or treatment is a question of fact, left to the judicial decision maker. In order to be needed, treatment must be more than merely beneficial to the prisoner. *See United States v. Eckerson*, 299 F.3d 913 (8th Cir. 2002); *United States v. Horne*, 955 F.Supp. 1141, 1147 (D. Minn. 1997). The Eighth Circuit in *Watson*, 893 F.2d 982, held that it is more favorable to restore an inmate's ability to function in the general population through forced medication, than keep an inmate in seclusion, even if he functioned adequately there. In other words, the court in *Watson* found that "need" does exist if treatment would enable the prisoner to function in the general population.

Here, the government has established "need" by presenting evidence that Lassiter cannot function in the general prison population. Lassiter suffers from hallucinations and delusions about witches. The witches speak to him and tell him to rape or harm others. Lassiter has told Dr. Shine that he requests to be placed in the SHU to keep himself from harming others in the ways the witches tell him to do so. Dr. Shine also testified that Lassiter shadow boxes to fight off the witches whom Lassiter thinks are attacking him. Dr. Shine testified that he believes Lassiter is at risk of harming others. Under these circumstances, the Court recommends that Lassiter is in need of custody for care and treatment.

The Court also recommends that FMC Rochester is a suitable facility for Lassiter's treatment. Dr. Shine testified that FMC would be a suitable facility and Lassiter has not presented any evidence to the contrary.

**III. RECOMMENDATION**

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that the United States' Petition to Determine Present Mental Condition of an Imprisoned Person under 18 U.S.C. § 4245 [#1] be **GRANTED**. Lassiter should be committed to the custody of the Attorney General and hospitalized at FMC Rochester.


DATED: December 5, 2007                          s/ *Franklin L. Noel*
                                                 FRANKLIN L. NOEL
                                                 United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **December 24, 2007**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **December 24, 2007,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.